1                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE

2

3   * * * * * * * * * * * * * * * * *
                                *

4   UNITED STATES OF AMERICA      *
                                *

5                            * No. 1:21-cr-00021-SM-1
             v.         *   1:20-mj-00229-AJ

6                        * January 28, 2021
                        * 9:25 a.m.

7   RYDER WINEGAR,           *
                                *

8                    Defendant.   *
                                *

9   * * * * * * * * * * * * * * * * *

10

11            TRANSCRIPT OF DETENTION HEARING
                HELD VIA VIDEOCONFERENCE

12       BEFORE THE HONORABLE ANDREA K. JOHNSTONE

13

14   APPEARANCES:

15   For the Government:    AUSA Charles L. Rombeau
                      United States Attorney's Office

16

17   For the Defendant:     Charles J. Keefe
                      Wilson Bush & Keefe PC

18

19   U.S. Probation:        Karin Hess

20

21   Court Reporter:         Brenda K. Hancock, RMR, CRR
                      Official Court Reporter

22                      United States District Court
                      55 Pleasant Street

23                      Concord, NH 03301
                      (603) 225-1454

24

25

1                    P R O C E E D I N G S

2          THE CLERK:  This Court is now in session and has

3     before it for consideration a continued detention hearing via

4     videoconference in the matter of The United States versus Ryder

5     Winegar, case number 20-mj-229-AJ.

6          Will counsel for the government and counsel for the

7     defendant please identify themselves for the record.

8          MR. ROMBEAU:  Hi.  Good morning.  Charles Rombeau for

9     the government, your Honor.

10         MR. KEEFE:  Good morning.  Charles Keefe on behalf of

11    Mr. Winegar, who appears by video from the Merrimack County

12    Department of Corrections.

13         THE COURT:  All right.  Good morning, Counsel.

14         And good morning, Mr. Winegar, sir.

15         THE DEFENDANT:  Good morning, your Honor.

16         THE COURT:  Just as a preliminary matter, before we

17    get started I want to be sure that everyone participating by

18    video or telephone conference today understands that we have a

19    local rule here in this District; it's Local Rule 83.8.  That

20    rule prohibits anyone who is participating remotely in this

21    proceeding by video or telephone from recording, photographing,

22    broadcasting or televising any of these proceedings.  This

23    prohibition applies to counsel, the parties, the media and any

24    member of the public.

25         Mr. Winegar, before we get started today, I want to

1    talk with you about the manner in which we are conducting

2    today's proceeding.  We are doing this by video.  This is not

3    the way that we normally conduct detention hearings, and you

4    know that because we had our first detention hearing in person

5    or the beginning of this hearing in person, and that's your

6    right.  You have the right to an in-person proceeding, and the

7    court is prepared to hold an in-person proceeding at the time

8    that it can be arranged, if that is your preference, because

9    it's your right.

10        But I understand that you have communicated and

11    consulted with your counsel, and I have some paperwork that

12    suggests that or indicates that you've consulted with counsel,

13    and, after doing so, that you now understand that you can waive

14    that right and that you can consent to proceed by video.

15        The document before me is entitled Consent to

16    Videoconference/Telephonic Conference and Waiver of Right to

17    Appear in Person, and the document notifies the Court that,

18    after consulting with your attorney, that you knowingly and

19    voluntarily consent to having your bail, bail review or bail

20    reconsideration hearings conducted by video or telephonic

21    conference, and that you knowingly and voluntarily waive your

22    right to be present in person, in open court as to those

23    proceedings.  It's electronically signed, so I need to ask you

24    a couple of questions.

25        Do you, sir, waive your right to an in-person

1   proceeding?

2           THE DEFENDANT:  I do, your Honor.

3           THE COURT:  And do you consent to having this bail

4   hearing, a continuation of this bail hearing, conducted by

5   video?

6           THE DEFENDANT:  I do consent, your Honor.

7           THE COURT:  All right.  And do you do that knowingly

8   and voluntarily, after consulting with Attorney Keefe?

9           THE DEFENDANT:  Yes, that's correct, your Honor.

10          THE COURT:  All right.  And did you authorize Attorney

11  Keefe to sign this waiver and consent form that I have before

12  me?

13          THE DEFENDANT:  Yes, I did authorize Mr. Keefe to --

14          THE COURT:  All right.  Very good.  So, the Court

15  finds that Mr. Winegar, after consulting with Attorney Keefe,

16  has knowingly and voluntarily waived his right to be present in

17  person in open court for the continuation of this detention

18  hearing, and that he has knowingly and voluntarily consented to

19  proceed by video.

20          The Court notes that conducting today's proceeding by

21  video results in a partial limitation to the public's right to

22  access proceedings, in particular, the right to access an

23  in-court proceeding, and I have made individualized findings as

24  they relate to those partial limitations.  I incorporate them

25  by reference, and they are also docketed.

1          Mr. Winegar, let me just remind you that you are not

2     required to make any statement in this matter; you do not need

3     to say anything to anyone; if you start to make a statement you

4     have the right to stop at any time; and anything that you say

5     may be used against you.

6          Do you understand those rights?

7          THE DEFENDANT:  Yes, I do, your Honor.

8          THE COURT:  All right.  Very good.  And you do have

9     the right to court-appointed counsel, if you qualify.  The

10     Court understands that you have retained Attorney Keefe, and

11     that you do not wish court-appointed counsel.  Is that correct?

12          THE DEFENDANT:  That's correct, your Honor.

13          THE COURT:  All right.  Very good.  So, Mr. Winegar,

14     there's one more thing that I need to review with you.  When

15     you're present in person in open court you have your attorney

16     right next to you; you can ask the Court to step away so that

17     you can have a private confidential conversation; you can

18     sometimes meet before the Court appears privately and

19     confidentially; sometimes you can have conversations right next

20     to each other while you're sitting next to each other that are

21     private and confidential.  This circumstance is a little

22     different, but you still have the ability to communicate

23     privately and confidentially with Attorney Keefe.

24          So, here's what you need to know:  If at any point in

25     time in today's proceeding you would like to speak with

1    Attorney Keefe, you just need to let me know.  Feel free to

2    interrupt me or anyone else who is speaking and say, Judge, I'd

3    like to communicate with my counsel; I need to talk with Chuck.

4    If that happens, we will pause this proceeding; my case manager

5    will open a virtual breakout room.  You'll see an invitation to

6    join that room come up on your screen.  If you're using a

7    tablet or an iPad you'll use your finger to join.  If you have

8    a desktop or a laptop in front of you, you'll use your mouse

9    and you'll click to join.  Attorney Keefe will do the exact

10   same thing.  He'll be the only other person that gets that

11   invitation.  The two of you will go into the breakout room.

12   You'll be able to see him, you'll be able to hear him.  He will

13   be able to do the same with you.  You'll speak privately and

14   confidentially, and when you're done you'll either elect to

15   leave the breakout room, or the breakout room can be closed,

16   and that will bring you back here.  Okay?

17             THE DEFENDANT:  Very good, your Honor.

18             THE COURT:  All right.  Very good.  And you can do

19   that as many times as you would like.

20             THE DEFENDANT:  Understood, your Honor.

21             THE COURT:  All right.  Very good.

22             Okay.  So, Counsel, are we prepared to proceed?

23             MR. KEEFE:  Yes, your Honor.

24             THE COURT:  All right.  So, I have received an

25   addendum to the Pretrial Services Report.  I am not clear as to

1   whether, Attorney Rombeau, you would like to proceed, or

2   whether, Attorney Keefe, there are housekeeping matters that

3   you would like to address with the Court before I turn it over

4   to Attorney Rombeau.

5            MR. KEEFE:  I can't think of any housekeeping matters.

6            THE COURT:  All right.  Then, I'm going to turn it

7   over to Attorney Rombeau and ask him to proceed, pick up where

8   we left off, please.

9            MR. ROMBEAU:  Thank you, your Honor.

10           THE PROBATION OFFICER:  Your Honor --

11           THE COURT:  Yes.

12           THE PROBATION OFFICER:  -- I just want to -- I'm sorry

13   to interrupt, but I just wanted to clarify just two matters in

14   the report that I sent that's dated January 26.  I put that he

15   appeared for his detention hearing on January 14th, but it

16   should be corrected to be January 15th for the detention

17   hearing.

18           And then also in regards to the firearms that I listed

19   in my report, I sent all parties emails from the actual

20   individuals who provided me that information, and those have

21   the corrected listed -- or the individual firearms or property

22   that were the accurate property that was received.  So, I just

23   wanted to make sure that that was put on record for the Court.

24           THE COURT:  Okay.  So, let me ask counsel this:  Is

25   there any objection to the Court incorporating by reference, so

1   to speak, to Officer Hess's report the two emails that contain

2   an inventory or the receipt of what each of those individuals

3   has reported to Probation they have taken custody of in terms

4   of firearms and ammunition or any other weapons?

5          MR. ROMBEAU:  Not from the government, your Honor.

6          MR. KEEFE:  And, your Honor, I didn't know if that's

7   what the Court was alluding to.  I was going to address what

8   Officer Hess just did, and I appreciate what she said.  I think

9   the Court should know I sent two responses to Attorney Hess

10  about the addendum to the report, one late afternoon, early

11  evening last night and then one this morning.  The corrections

12  she just made had to do with the one last night.  The one this

13  morning was about finances and a line about travel.  I will

14  address those substantively in my portion of the argument.

15         THE COURT:  Thank you.  That's fine.  I don't have a

16  problem with that at all.

17         And thank you, Officer Hess, for raising those two

18  other issues.

19         So, Attorney Keefe, if I understand you correctly,

20  you're not objecting to having the Court incorporate by

21  reference the inventories or the receipts or the email

22  communications that Officer Hess received from the custodians

23  of the firearms?

24         MR. KEEFE:  I am not, your Honor.  I'm going to

25  address one of those situations, and there's someone here to

1   support an offer of proof, should it become necessary.

2          THE COURT:  Okay.  That's fine.  That way at least

3   we're in agreement as to what the list is.  We can talk about

4   the other pieces, and your witnesses may amend them, and that's

5   fine, too.

6          MR. KEEFE:  Thank you.

7          THE COURT:  All right.  Okay.

8          All right.  So, Attorney Rombeau, I am going to turn

9   it over to you, then, and I am also going to tell counsel that,

10  to the extent that it's helpful to you, I'm not going to object

11  to going over or referring to things that happened in the first

12  hearing.  I don't expect this to be a redo, so to speak, but

13  it's understandable if there are some things that are repeated.

14  Okay?  Thank you.

15         MR. ROMBEAU:  Thank you, your Honor.  The government

16  has had a chance to review the addendum to the Pretrial

17  Services Report and the correspondence from Attorney Keefe.

18         We continue to seek detention in this matter.  Our

19  view has not changed from the original hearing before your

20  Honor nearly two weeks ago, and that is that the defendant both

21  presents a risk of flight and a danger to the safety of the

22  community were he to be released.

23         As I mentioned on the first day, this is not a

24  presumption case, so it is the government's burden by clear and

25  convincing evidence on the safety of the community and by a

1    preponderance of the evidence on the risk of flight, so we

2    embrace that it is our burden here.

3          I won't go through all the factors that we covered two

4    weeks ago, but I think the theme that has resonated with me as

5    we've reviewed these updates and the like is that there have

6    been, from our viewpoint, substantially there are omissions in

7    the first instance.  Whether those are intentional or

8    inadvertent, they present a picture that is muddied, from our

9    standpoint.

10          Your Honor certainly recalls from two weeks ago the

11   issue with the firearms, that in the initial Pretrial Services

12   Report one firearm was disclosed, and only after presented with

13   information from the government that several additional

14   firearms had been located at the property in December were

15   those firearms later disclosed.  Those are, as I understand it,

16   all accounted for now and are not in the home, but omissions,

17   in our viewpoint, material omissions of that nature, when a

18   defendant is seeking the Court's trust to be released, are

19   concerning.

20          And those have continued in a couple of other material

21   respects.  One is the defendant's financial resources.  The

22   initial explanation offered on site in December was that the

23   defendant had come into substantial funds and was flying to

24   Brazil to look at properties to purchase.  We now know, based

25   on representations from counsel last night, that the defendant

1   and his family are living paycheck to paycheck.  And I don't

2   know or, frankly, I don't know that -- defendant's financial

3   resources are not a material factor for the Court to consider,

4   but when there's an inconsistency of the picture that's

5   presented, that's what's of real concern to us; that we try to

6   make these decisions, and the Court tries to make these

7   decisions based on as complete information as possible and

8   truthful information, and when really diametrically opposed

9   information is provided, that's a problem.

10          The third, I'll call it, discrepancy that I want to

11  highlight here today is about some disclosures the defendant

12  made to Pretrial Services.

13          MR. KEEFE:  I'm going to object, your Honor, and I

14  just cautionarily (ph) object.

15          If I could ask counsel for the government, is this

16  about the report you sent to Probation yesterday?

17          MR. ROMBEAU:  It is, it is.

18          MR. KEEFE:  I'm going to object to that and ask if we

19  can address it off the record for the Court to -- or at least

20  at the bench, for lack of a better phrase.

21          THE COURT:  Yes.

22          MR. ROMBEAU:  Happy to do that, your Honor.

23          THE COURT:  All right.  So, here's what I'd like to

24  do:

25          Brier, if you could please create a sidebar, so a

1    virtual room for myself, Attorney Rombeau and Attorney Keefe,

2    and we will address that at that juncture at sidebar.

3              THE CLERK:  Absolutely.

4              THE COURT:  Thank you.

5              THE CLERK:  Just a quick question.  Do you need the

6    court reporter in there as well?

7              THE COURT:  Yes, I would like the court reporter in

8    there as well, please.

9              THE CLERK:  Okay.  Thank you.

10             MR. KEEFE:  I misspoke when I said "off the record."

11   I meant at the bench, however we do that now.

12             THE COURT:  I know what you mean.  You mean not in the

13   full videoconference.

14             MR. KEEFE:  Right.

15                          (Sealed proceedings)

16             THE COURT:  Okay.  Thank you, Counsel.  Let me just,

17   for the record, indicate that in the sidebar, which is sealed,

18   counsel and the Court discussed a matter, and, having concluded

19   the discussions, the parties were able to reach an agreement as

20   to how to proceed by proffer.  It is a narrow proffer.

21             And, Attorney Rombeau, at the appropriate time you

22   should feel free to make it.

23             And I understand, Attorney Keefe, that you will be

24   responding to that proffer in the context of your presentation

25   to the Court.

1          So, Attorney Rombeau, you are muted, and we were just

2     before the breakout room hearing your additional argument.  So,

3     I will turn it over to you, sir.

4          MR. ROMBEAU:  Thank you, your Honor.  I'll go into

5     that issue right now, and that is, we wanted to represent to

6     the Court that we obtained information that in June of 2017 the

7     defendant reported to a member of law enforcement that he had a

8     prior diagnosis of PTSD and had been in counseling since 2012.

9     And I bring that up only to contrast with information provided

10    to Probation Officer Hess at his interview a couple of weeks

11    ago, which is that there was no history of mental health either

12    diagnoses or treatment, and that was sort of at the end of

13    where I would say I think the third sort of, whether we call it

14    discrepancy or disconnect, where information was at least

15    inconsistent information.  Whether these omissions or

16    discrepancies can be explained I leave to Attorney Keefe, but

17    when there's a pattern of them, that is what is of particular

18    concern to the government, and we would suggest that the three

19    sort of buckets that I've highlighted for the Court do

20    establish a pattern that there's been inconsistent information

21    from which the Court can rely in essentially taking the

22    defendant at his word.

23         I won't go into all the other 3142 factors that we

24    discussed at the prior hearing and will just rest on our prior

25    arguments on that point and conclude with the comment I made at

1    the first hearing, which is that I don't think this is a matter

2    we initially expected would be a detention hearing, but in

3    light of the flight to Brazil and the subsequent information

4    that has come to light, our view is that there are no

5    conditions of release or combination of conditions that will

6    reasonably assure both the appearance of the defendant as

7    required and the safety of the community, were the defendant to

8    be released.  Thank you.

9            THE COURT:  Thank you.

10           Attorney Keefe, I'm going to turn it over to you.

11           And then after Attorney Keefe's presentation, Attorney

12   Rombeau, you'll have another opportunity to respond.

13           Attorney Keefe.

14           MR. KEEFE:  Thank you, your Honor.  We want to

15   highlight again that this is not a presumption case, as the

16   Court often has to address, and the government bears a

17   significant burden in this regard, and the facts and

18   circumstances here not only simply don't support the

19   government's burden, they support release under the conditions

20   which we submit here, and those are additionally or

21   substantively electronic monitoring, which is what we discussed

22   previously, at the original detention hearing.  Officer Hess

23   has informed that, if the Court does release Ryder to

24   electronic monitoring, he will need to obtain a cell phone.  We

25   can have that done immediately; his wife will be able to do

1   that immediately.

2           Secondly, your Honor, as often happens in the real

3   world, when we were before the Court in the in-person detention

4   hearing we represented to the Court that Ryder and his wife had

5   their home on the market, there was a sale pending with a

6   closing date.  Those of us who have bought and sold homes

7   understand that those things can often be in flux.  Due to a

8   home inspection, that deal is not going to be happening.  The

9   buyers made a counteroffer, Ryder and his wife are withdrawing

10  from that sale, and they are not going to be selling either

11  their home or either of their rental properties while this

12  matter is pending.

13          In that regard, your Honor, if the Court feels it

14  necessary, Mr. Winegar and his wife, who are the two joint

15  tenants on the deed of all three properties, would secure an

16  appearance bond by all three of the properties he and his wife

17  own, his residence in Amherst and the two rental properties in

18  Manchester.

19          So, those are the big chunks of our release plan in

20  addition to any other conditions the Court would impose upon

21  him, to include a mental-health evaluation, should the Court

22  feel it necessary, and comply with any treatment

23  recommendations.

24          Your Honor, today I'm going to address appearance, and

25  I'm not going to review everything that I've previously argued.

1          THE COURT:  Okay.

2          MR. KEEFE:  I know the Court has notes and a good

3    memory.  But one thing that I was able to confirm and submitted

4    to Probation and the government was that Ryder had booked a

5    return flight at the time he had booked his flight.  I know

6    that was an issue at the original detention hearing.  I

7    received the Expedia booking that showed a return flight booked

8    at the time the departing flight was booked, and that return

9    flight was for January 18th, as well, and I highlight this,

10   because now it is -- the assessment of nonappearance in the

11   Probation report now suggests that the defendant's conduct

12   during arrest for the instant offense is a factor to consider

13   for risk of nonappearance.

14          I will remind the Court and highlight for the Court

15   again, when Mr. Winegar learned there was an arrest warrant he

16   found counsel, hired counsel, counsel engaged with the

17   government, and not only did he return voluntarily to the

18   United States through counsel; he informed the government of

19   the flight, airline, and number, airport and arrival time for

20   when he was coming back into the United States, and he

21   presented himself to be taken into custody.  We have since as

22   well provided Probation with a copy of the visa that my client

23   obtained in 2019 for Brazil.  So, he traveled to Brazil, an

24   interest in Brazil existed prior to this trip.

25          And I will address one thing.  It was the

1   government's -- well, I'll address all of them, but now,

2   because it's relevant, the government suggested that they were

3   informed that Ryder and his wife had come into a significant

4   amount of money, and so he was in Brazil looking for property.

5   That's not what was represented.  Prior to this event happening

6   Ryder and his wife, as you know, were selling, in the process

7   of selling their home, and the two of them were considering

8   moving to Brazil after the sale of that home.  So, we factually

9   contest that representation.  Trish Winegar is on here to

10  support an offer of proof.

11       Getting back to the risk of flight, your Honor, the

12  government, or I don't know if the Clerk's Office or it's the

13  government, one of them has my client's passport at this point.

14  I know that the Marshals provided it to the government.  I

15  don't know if it's still in the government's possession or if

16  it is with the Court.  My client's wife, Trish, she will

17  surrender her passport as well, if she hasn't already.  The

18  children do not have passports.

19       And the children, your Honor, ultimately the number

20  one reason my client will not flee this matter is because he

21  misses his kids terribly and wants to get home to be with them

22  and take care of them.  The Court may recall in the first

23  hearing he's a stay-at-home dad who also managed the rental

24  properties.  He hasn't seen his kids for some time, and that is

25  the greatest weight and anchor that will tie him to the

1    jurisdiction during the pendency of this matter.  As I

2    previously went over for the Court, he has many, many ties to

3    New Hampshire.  He is from here, he grew up here, he went to

4    college here.

5         Regarding the family finances, your Honor, I sent an

6    email to Probation and the government this morning adding some

7    information, and I just don't think that the forms that

8    Probation used allow for the information that I provided, but

9    the financial section of the addended (ph) report suggests that

10   there's a positive monthly cash flow of $4,650.  We would

11   submit that there's actually roughly about $1,000 a month, and

12   that the reason for the difference between the two is, although

13   monthly income reflects rental income from the two properties

14   in Manchester, it does not reflect any expenses, it doesn't

15   reflect the mortgages, and it doesn't reflect utilities as

16   well.  So, those are significant numbers.  As well, Trish has a

17   small loan she pays off every month, and that's about $67 a

18   month.  And on top of all that the couple has significant

19   credit card debt, and they take chunks of cash and try to pay

20   that down, and that leaves them with 1,000 to $1,100 a month.

21   I don't want to air my client's finances in public --

22        THE COURT:  That's all right.

23        MR. KEEFE:  -- or on the record, but I wanted to add

24   that information for the Court, because he doesn't have the

25   resources to move or leave for any extended period of time,

1    especially considering his passport is now with the government

2    or the Court and he is proposing to be on electronic

3    monitoring.

4            I want to submit again for the Court regarding danger

5    he was not in Washington, D.C. on January 6th.  There are no

6    allegations he was involved in that in any way.  As well as the

7    allegations in the case, there were phone messages but no

8    evidence and no allegation, and my client will submit there

9    can't be, because he didn't do anything to actually do anything

10   more than leave phone messages.

11           For the guns and ammo and the vest, we disagree

12   vehemently with the government's representation that either my

13   client or his wife omitted anything, and we addressed that at

14   the time of the in-person hearing, and I know the Court

15   understands our position on that.  Most importantly, all but

16   the 9 millimeter were removed from the house on December 24th.

17   After we had our in-person hearing, the 9 millimeter and the

18   ammunition related to that was removed from the house as well.

19   Those were all sent to a Peter Allen.  The Court has an email

20   through Probation that documents that.

21           One thing that I would just add to that, and Mr. Allen

22   is here to support my offer of proof, is that I think the email

23   says everything was conveyed on December 24th, but, in

24   actuality, everything but the 9 millimeter and the 9 millimeter

25   ammunition were conveyed on December 24th.  The rest was

1   conveyed over the holiday weekend after our detention hearing,

2   and Mr. Allen noted for Probation in that email that the AR-15

3   and the 9 millimeter were not functional.

4            I'll remind the Court that my client has no criminal

5   history, and that he is a veteran of the United States Navy,

6   who was honorably discharged.

7            In terms of the flow of this matter as it's gone

8   through the initial bail interview and several detention

9   hearings and status hearings we have had, Probation originally

10   recommended release, and then it was after the government

11   provided information about the firearms that law enforcement

12   had seen in the home did it change its position.  In its report

13   recommending detention Probation used the word "dishonesty," my

14   client's dishonesty, and also said that the government's

15   evidence contradicted what he and his wife said.  I think the

16   Court is clear on my position on that, they were asked what

17   guns were in the house, and they honestly answered that

18   question.

19            As well, your Honor, at that time Probation

20   recommended detention under the nonappearance section for two

21   reasons:  lack of verifiable employment and ties to a foreign

22   country.  Now they're saying that it's not lack of verifiable

23   employment but the offense charged and/or conduct during the

24   arrest.  I just want to remind the Court that Probation was

25   aware of the offense charged at the time they did that first

1    report.  Secondly, conduct during the arrest, Mr. Winegar could

2    not have done anything more to make it easy and safe for law

3    enforcement by telling them the airline, the flight, the flight

4    number, time and airport where he was going to arrive and

5    presenting himself to be arrested on the warrant.  So, we

6    submit that factor does not support detention or a risk of

7    nonappearance.

8         As well, your Honor, under the danger to the community

9    or specific person, in that original report Probation noted the

10   nature of the offense and generally a safety concern for the

11   community or a specific person.  Since that time Probation has

12   now added a history of weapons possession or use.  All the guns

13   that were in the home were possessed legally.  There is no

14   allegation not only in this case but anywhere that Mr. Winegar

15   did anything unlawfully used -- possessed the firearms, and

16   there's no allegation or evidence that he unlawfully used them

17   in any way, to threaten anyone, to point them at anyone.

18   Anything he did was lawful possession or lawful use.

19        Under the plan we propose, your Honor, electronic

20   monitoring and the appearance bond secured by the real estate,

21   we submit that that will address any appearance or safety to

22   the community concerns.

23        As well, your Honor, Mr. Winegar will abide by any and

24   all conditions the Court sets on him, whether that is a curfew,

25   counseling.  He even suggested he would check in with Amherst,

1    PD, if required to do so.  The government, we submit, has not

2    met its burden, but, more importantly, the evidence here in a

3    non-presumption case demonstrates that the Court can structure

4    a release plan that addresses any concerns it might have.  And

5    the heart of the government's argument, your Honor, was that

6    there have been three omissions or three disconnects between

7    what Mr. Winegar has said and what Probation or law enforcement

8    has learned.  I've previously addressed the firearm issue, I've

9    addressed the financial resources issue, the allegation that

10   someone told law enforcement he came into a large amount of

11   money.

12           The last thing I want to address is a representation

13   that the government discussed that Mr. Winegar told a law

14   enforcement officer back in 2017 that he had been diagnosed

15   with PTSD and had been in counseling since 2012.  I'll just

16   note that that report was not taken at a Police Department.  It

17   was a conversation that Mr. Winegar had with a police officer

18   at a town hall.  The report was written the next day.  And Mr.

19   Winegar submits that he's never been officially diagnosed with

20   PTSD.  He said that informally to the officer, and, to the

21   extent that the officer represents that Mr. Winegar said he had

22   been in counseling, Mr. Winegar submits he's had one counseling

23   session in his entire life.  He's never been diagnosed by

24   someone with PTSD.  He's never been in counseling for a

25   repeated number of times.  When he was asked by Probation, Do

1    you have any mental health problems or anything like that or

2    any prior counseling, he didn't even think of this, because it

3    was such a discrete incident in time.

4         But that all being said, Ryder is willing to, as part

5    of his release plan, have a mental health evaluation to address

6    any concerns of the Court.  He's also willing to abide by any

7    other conditions the Court sets.  So, to the extent the

8    government's suggesting there's a pattern of dishonesty or

9    omissions, we vehemently, vehemently disagree with that.  What

10   we submit is happening is that the government takes whole or

11   partial information and then tries to use it as a

12   misrepresentation or an omission, and we object to that.  We

13   don't think it supports the government's burden, and we would

14   ask the Court to adopt our proposed release conditions.

15        THE COURT:  All right.  So, I have a question for

16   counsel and possibly for Probation.  I have not compared the

17   emailed weapons and ammunitions list to what was disclosed by

18   the government as the firearms and ammunition and weapons that

19   were observed and inventoried.  Has anyone done that, and are

20   they all accounted for?

21        MR. KEEFE:  I have, your Honor, and, Officer Hess,

22   please jump in, if you disagree, and counsel for the

23   government.  Reviewing the email that was provided, there are

24   four firearms at issue.  Mr. Allen documents he's received all

25   four firearms.  He also documents ammunition, the load-bearing

1    equipment vest with pouches, as well as magazines.  We submit

2    that everything is accounted for.  I don't know if Probation or

3    the government has a disagreement with that, but that's our

4    position based upon the information provided.

5            THE COURT:  Attorney Rombeau, have you done an

6    inventory check, and are you satisfied that all of the firearms

7    and weapons are accounted for?

8            MR. ROMBEAU:  We are, your Honor, yes.

9            THE COURT:  Okay.

10           MR. ROMBEAU:  Your Honor, may I respond briefly?

11           THE COURT:  Absolutely.

12           MR. ROMBEAU:  I don't want to belabor this, we're two

13   hearings in on this, but something Attorney Keefe said that I

14   feel like I just can't let stand, and that is the statement

15   that Mr. Winegar doesn't have the resources to leave for an

16   extended period of time.  That's what the statement was this

17   morning.  We know that not to be true, because he left for an

18   extended period of time.  But, based on the proffer offered

19   today for the first time, which is that he had a return date in

20   mind of January 19th, even taking that statement at face value,

21   that means the defendant booked a flight to Brazil, left within

22   24 hours Christmas week, planning to leave for a month, and

23   clearly had the resources to do it, because he did it.  So,

24   this is not a matter of speculation, and this is not a matter

25   of getting into his finances or not.  This is a matter of he

1    literally left the country and planned to be gone for a month.

2    I have not yet seen any documentation to suggest there was a

3    return date, and I have previously proffered to the Court that

4    the agents on site the day of the search warrant said that the

5    wife would not give a return date and said she did not know of

6    one.  So, the idea that there is not a risk of flight because

7    there are not resources to flee is demonstrably false in this

8    case.  This is a unique set of circumstances that we're faced

9    with here.  But the idea that this travel was anything other

10   than, you know, an attempt to avoid consequences for this

11   action I think is awfully farfetched, when we look at the

12   surrounding circumstances, the stated financial challenges, the

13   fact that Mr. Winegar is a stay-at-home dad leaving Christmas

14   week for a month.  None of that, frankly, passes the smell

15   test.

16         So, we're left with that there clearly are at least

17   sufficient resources to have allowed him to plan to flee the

18   country for 30 days, and to suggest otherwise I think is simply

19   at odds with what's happened here.

20         We'll rest on our remaining arguments about all the

21   other 3142 factors and leave it there for your Honor.  Thank

22   you.

23         MR. KEEFE:  Given that, your Honor, the government's

24   simply wrong.  First of all, there was no warrant at the time

25   my client went.  He had a pending sale of his home, and it was

1   the parties' intention -- not parties -- he and his wife's to

2   potentially move to Brazil.  Things have drastically changed

3   since then.  Their home is no longer for sale.  He is now under

4   a criminal complaint here in the United States.  And the

5   government -- I offered the government to provide them with an

6   email, if they wanted, the Expedia booking, we have that, that

7   when the flight was booked there was a return flight.  I didn't

8   hear anything from them.  As well, your Honor, an extended

9   period of time, when I said that, and maybe reasonable minds

10  can differ.  If my client were to leave the country he

11  essentially could never come back unless he would be taken into

12  custody, and he could not enter many other countries that have

13  treaties with the United States to detain someone who is wanted

14  on a federal warrant by the United States Government.  So, by

15  "extended period of time," what I suggested was he doesn't have

16  the ability to leave and stay gone.  That's what I suggested.

17       This is an almost academic argument, because we're

18  proposing electronic monitoring as well as the personal -- the

19  real estate appearance bond, and the government has his the

20  passport.

21       THE COURT:  All right.  Attorney Rombeau, anything

22  further?

23       MR. ROMBEAU:  Just, your Honor, I will confirm that

24  the government does have the passport.  It was provided by the

25  U.S. Marshals at the in-person hearing, and, as I understood

1  it, the Clerk of Court would not take it yet because the matter

2  was still pending, but it is in the government's possession

3  pending your Honor's decision.

4         MR. KEEFE:  And we obviously have no objection to

5  having that surrendered by agreement to the Court.

6         THE COURT:  Okay.  All right.  So, Attorney Keefe, in

7  terms of your proposal to bond the three properties, what's the

8  total -- I didn't do the addition; I don't know if you have it

9  -- of the equity.

10         MR. KEEFE:  The equity in the properties is -- I

11  thought I had that.

12         THE COURT:  That's okay.  I can add it later.

13         MR. KEEFE:  His wife can address that, what the

14  total --

15         THE COURT:  I think I have the numbers.  I don't need

16  that.  I just thought if you had it handy.

17         MR. KEEFE:  I don't have that number handy, your

18  Honor.  I apologize.

19         THE DEFENDANT:  It's roughly $300,000, your Honor.

20         THE COURT:  Thank you, sir.

21         THE DEFENDANT:  You're welcome, your Honor.

22         THE COURT:  Okay.  Attorney Rombeau, anything further?

23         MR. ROMBEAU:  No, your Honor.  Thank you.

24         THE COURT:  All right.  Thank you.  I'm just reviewing

25  some notes.  Bear with me, please.

1          (Pause)

2          THE COURT:  All right.  Attorney Keefe, you indicated

3     that you have the Expedia information, and my recollection was

4     that Ms. Winegar showed Capitol Police an American Express

5     entry of some kind that showed when the ticket to Brazil had

6     been purchased.  Does your Expedia documentation show when that

7     ticket, both the departure and return flight, had been booked,

8     and are they on the same document, or are we talking about

9     multiple documents?

10         MR. KEEFE:  Your Honor, I'm looking at an email from

11    Expedia, and it is one email.  The email is Sunday, December

12    20th, and it says, Thank you, Ryder, your flights are booked,

13    and it has one whole travel itinerary for the flight to Brazil,

14    and then in the same itinerary in the same email in the same

15    document on its continuation from the landing in Brazil and

16    then has the return flight itinerary to return to Boston.

17         THE COURT:  All right.  And that email from Expedia is

18    dated December 20?

19         MR. KEEFE:  Yes, your Honor.

20         THE COURT:  Okay.  And when was the purchase and sale

21    agreement signed for the Amherst property?

22         MR. KEEFE:  To potentially sell it?  That either Ryder

23    or Trish can specifically answer.

24         Ryder, do you know the date?

25         THE DEFENDANT:  I don't know off the top of my head.

1       MR. KEEFE:  Your Honor, if his wife Trish could

2   address that.  She's on the Zoom.

3       THE COURT:  Sure.  I'd be happy to hear from her, if

4   she knows what the date was.

5       MR. KEEFE:  Trish, what was the date of the P&S?

6   You're on mute.  There you go.

7       MS. WINEGAR:  Can you guys hear me?

8       MR. KEEFE:  Yes.

9       MS. WINEGAR:  I don't particularly know the date.  I

10  can look it up, if you guys give me a little bit of time.

11      MR. KEEFE:  Do you know roughly when it was while

12  you're looking it up?

13                      (Pause)

14      MS. WINEGAR:  Hello?  I remember Ryder signed it on

15  the date of the hearing, so that's when the signing first

16  happened, before they changed the addendum.

17      THE COURT:  All right.  Thank you.  Okay.  That's

18  helpful.

19          Anything else, Attorney Rombeau?

20      MR. ROMBEAU:  Your Honor, I know the Court keeps good

21  notes on this.  I'll just note again for the record that

22  December 20th is the day that the Capitol Police knocked on his

23  door and announced their presence, and the defendant was aware,

24  certainly, of their existence.

25      THE COURT:  Okay.  All right.  Very good.  So, I'm

1   taking this matter under advisement.  I am not issuing a ruling

2   from the bench today.

3          And in the interim, Mr. Winegar, you will continue to

4   be detained until the Court either orders conditions of release

5   ordering that you be released on conditions, or I issue a

6   ruling ordering that you be detained.

7          To the extent that either party determines that there

8   is something that comes to light that necessitates a reopening

9   or a further submission, please let the Court know while I have

10  it under advisement.  I hope to issue a ruling very soon.  All

11  right.

12         Attorney Keefe, anything further?

13         MR. KEEFE:  Nothing further, your Honor.  Thank you.

14         THE COURT:  All right.  Thank you very much.

15         Mr. Winegar, I want to stress to you how important and

16  carefully I am considering this matter.  Your attorney has been

17  very thorough and very conscientious in his representation, and

18  I just need a few moments to reflect on all of the information

19  that's been provided.  There's just been a lot that's come

20  quickly to the Court at the end of the day, there have been a

21  couple of things that have changed, and so I need to evaluate

22  all of the information so that I can issue my ruling, having

23  thought through everything very carefully.  Okay, sir?

24         THE DEFENDANT:  I understand, your Honor.

25         THE COURT:  All right.  Thank you so much.

1            All right.  Thank you, everyone.  I appreciate it.

2            MR. KEEFE:  Thank you, your Honor.

3            THE COURT:  Thank you very much.  Have a good day.

4            MR. ROMBEAU:  Thank you, your Honor.

5            MR. KEEFE:  You too.

6        (WHEREUPON, the proceedings adjourned at 10:34 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

32

1                          C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Court

5     Reporter of the United States District Court, do hereby certify

6     that the foregoing transcript constitutes, to the best of my

7     skill and ability, a true and accurate transcription of the

8     within proceedings.

9

10

11

12

13    Date: ___8/14/21              /s/ Brenda K. Hancock
                                    Brenda K. Hancock, RMR, CRR
14                                  Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25