UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

_____

UNITED STATES OF AMERICA )
)
)    Cr. No. 21-CR-00021-1
v. )
)
RYDER WINEGAR )
_____)

### SENTENCING MEMORANDUM AND MOTION FOR *BOOKER* VARIANCE

NOW COMES the Defendant, Ryder Winegar, by and through his counsel, Wilson, Bush & Keefe, P.C. ("the Defendant"), and hereby files the present sentencing memorandum and motion for *Booker* variance, respectfully requesting that the Court impose a sentence of time-served (which would be substantively the equivalent of more than 12 months and one day of incarceration) followed by a term of supervised release.  In the alternative, should the Court impose a sentence longer than time-served, the Defendant respectfully requests that the Court order that remainder of the sentence be served on home confinement followed by term of supervised release.  In support thereof, the Defendant submits the following:

This motion is predicated upon the Court's Standing Order on Procedure for Requesting Deviation from Sentencing Guidelines; 18 U.S.C. § 3553(a); United States v. Booker, 543 U.S. 220 (2005); Rita v. United States, 551 U.S. 338 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Gall v. United States, 552 U.S. 38 (2007); United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006), *cert. denied*, 127 S.Ct. 928 (2007); and their progeny.

### I.    Introduction

On January 11, 2021, Ryder Winegar ("Ryder") voluntarily surrendered to federal law enforcement officials after the United States charged him by complaint with Threats Against Members of Congress in violation of 18 U.S.C. § 115(a)(1)(B).  The Court detained Ryder after

several hearings regarding detention.  On February 8, 2021, the government obtained a seven-count indictment charging him with six counts of Threats Against a Federal Official in violation of 18 U.S.C. § 115(a)(1)(B) and one count of Interstate Threatening Communications in violation of 18 U.S.C. § 875(c).

Pursuant to continuous discussions with the government, on August 6, 2021, Ryder pled guilty to counts one through seven of the indictment.  The Court then scheduled this matter for sentencing.

Regarding his pre-trial adjustment to his more than 10 months of incarceration, Ryder self-reported two incidents to probation in which he was involved while at the Merrimack County Department of Corrections.  As the Court is aware, Ryder had never been incarcerated prior to his arrest in this matter, and he has a wife and two children at home.  His separation from his family, due to his own actions in this case, has caused him a great amount of stress and anxiety which has occasionally manifested itself in the instances described in the paragraph seven of the Presentence Report ("PSR").  However, Ryder has participated in the RU Inside Jail & Prison Program during his incarceration, and he has obtained several certificates regarding his continued and successful participation in that program.

Ryder has used his incarceration to reflect not only upon the acts with which he is charged here, but also what led to those acts.  This has involved an incredible amount of self-reflection and honest consideration of what brought him from being a decorated and honorably-discharged Navy veteran to someone charged in United States federal court with threatening members of Congress.  As the Court will hear during his allocution, his children and wife are the most important things in his life, and he will never do anything again to be separated from them

or cause them the shame and humiliation he has brough upon himself and his family in this matter.

A simple Google search of Ryder's name reveals that he has been publicly shamed for his actions in this matter along with being incarcerated and becoming a federal felon.  News reporting regarding Ryder range from the Manchester Union Leader, WMUR television, NBC Boston, and CBS.  In fact, one online news agency went so far as to mock Ryder not only for his actions in this case but for their sheer "idiocy" by leaving his name and phone number in some of the subject voicemails.  As the Court is well aware, due to the Internet these stories about Ryder's actions and convictions will follow him and his family around for the rest of his life.  He understands that he has earned this 'red lettering,' but his family does not deserve to suffer the consequences of his actions.

## II.     Guideline Analysis

Ryder has accepted responsibility for the subject crimes in this matter.  In substance, he agrees with the government's statement of offense conduct.  More importantly, Ryder will denounce the disgusting, offensive, and violent language and thoughts he expressed in the subject voicemails.  As the Court will hear more from Ryder at sentencing, he has used his time while incarcerated to recognize the political hysteria in which he became embroiled during the fall and winter of 2020.  He does not and will not seek to excuse his actions, but he would like the Court to know that he is humiliated not just by his actions but as well by the thought patterns that caused him to engage in this conduct.  He denounces not only his actions but also the views expressed by those voicemails.  Ten months in jail, without using alcohol and being away from his family, quickly allowed Ryder to understand the dysfunctional group-think to which he subscribed and its effect on our country as a whole.

As well, he asks the Court to especially consider the following information in addition to that contained in the PSR about the offense conduct.  The first six counts of the indictment describe voicemail messages Ryder left at the offices of six different members of the United States Congress (leaving consecutive messages at one member's office).  The first voicemail was left on December 16, 2020, at approximately 12:50 a.m., and the second voicemail was left 32 minutes later.  Six of the seven charges here occurred in a 32-minute timeframe, one right after the other.  In a very substantive and meaningful way, these six charges were one continuous act. The nature of his actions, hanging up and making separate calls, has allowed the government to charge him with six different counts, thus adding a substantial offense-level enhancement under the grouping protocols of the guidelines (five levels).

As well, and although the government does not assert that Ryder had any intent to carry out any of the threats described in the voicemails, and he vehemently asserts he had no such intent.  Ryder will not parse the word choice and verbiage used in the messages.  They are disgusting.  However, although incredibly serious, there are parts of the messages that clearly reflect that not only Ryder had no intent to carry out the threats, but he was also not looking to 'get away' with leaving these voicemails.  He left his name and telephone number in several of the messages, and he also made these calls from a telephone that was easily traced back to him. As well, in the count that describes the email, he sent it from his own, personal email address and left his name in the body of the email.

The PSR correctly captures the technical guideline calculation in this case.  The base offense level is 12.  There is a six level enhancement pursuant to U.S.S.G. § 3A1.2(b) as the subject threats were motivated by the victims' status as government employees.  However, and Ryder recognizes the common law on this issue allows for this enhancement, the offenses to

which Ryder pled guilty intrinsically recognize the offenses were motivated by the victims' status as members of Congress, as the subject counts all allege Ryder threatened a member of the United States Congress "with the intent to impede, intimidate, and interfere" with that member of Congress while "he/she was engaged in the performance of his/her official duties." Thus, although this enhancement is applicable in this instance, it adds six levels to the total offense level for an enhancement that is substantively recognized in the charge itself.

Therefore, the total offense level in this matter is 23, but that offense level has been nearly doubled due to 11 levels of enhancements that the Court should consider in the overall context of the reasonableness of any sentence compared to the technical guideline analysis.

Ryder agrees that he has zero criminal history points, and thus has a criminal history category ("CHC") of I.

Finally, as stated, Ryder has accepted full responsibility for his crimes and is awarded a three-level downward adjustment. Therefore, using an adjusted base offense level of 23, subtracting the three levels for acceptance of responsibility, Ryder's total offense level becomes 20. With a CHC of I, this places him in a range of 33-41 months in the U.S.S.G. Sentencing Table.

However, Ryder asks the Court to consider Application Note 4(A) to section 2A6.1 of the Sentencing Guidelines: "The Commission recognizes that offenses covered by this guideline may include a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense level. Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted. See Chapter Five, Part K (Departures)." Section 5K2.0(a) provides that he

sentencing court may depart from the applicable guideline range if the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists a mitigating circumstance.

Combining these two provisions of the guidelines and applying them to this case, Ryder submits that the Court may depart from the stated guideline level based upon the unique circumstances of this case. Initially, Ryder did not seek to hide himself in any way when he committed these acts (leaving his name and phone number, using his own email address, etc.), thus suggesting that his true intent was not convey an actual threat to the victims but instead to inappropriately voice his then-existing political views in an abhorrent manner. As well, although these were serious and criminal acts committed by Ryder, they did not seem to engender the fear or anxiety that is contemplated by the guideline. Further, although the sentencing guidelines treat these as separate and distinct acts, their commission one-after-the-other reveals that these acts were committed with one intent and in essentially one continuous act. The grouping enhancement here does not truly reflect the acts or circumstances of the acts at issue. For these reasons, Ryder asks the Court to initially depart from the guidelines.

As well, for the reasons that follow, Ryder requests that this Court vary downward to the requested sentence to the extent it does not depart from the stated guideline calculation.

## III.    Motion for <u>Booker</u> Variance

### A.    Legal Basis

Ryder moves for a variance from the TOL found in the PSR. Such a variance may be premised on the following: the Court's <u>Standing Order on Procedure for Requesting Deviation from Sentencing Guidelines</u>; 18 U.S.C. § 3553(a); <u>United States v. Booker</u>, 543 U.S. 220 (2005) (making the U.S.S.G. advisory only)[1]; <u>Rita v. United States</u>, 551 U.S. 338, 127 S.Ct. 2456

---

[1] The sentencing factors which <u>Booker</u> requires the district courts to consider include:

(2007); <u>Kimbrough v. United States</u>, 522 U.S. 85, 128 S.Ct. 558 (2007); <u>Gall v. United States</u>, 522 U.S. 38, 128 S.Ct. 586 (2007); <u>United States v. Jimenez-Beltre</u>, 440 F.3d 514 (1st Cir. 2006), *cert. denied* 127 S.Ct. 928 (2007).

In light of the fact that the U.S.S.G. are now only advisory, this Court may now consider those mitigating factors that the advisory guidelines prohibit: e.g., poverty, racial discrimination and humiliation, drug abuse and addiction, dysfunctional family background, lack of guidance as a youth, etc. <u>See</u> <u>United States v. Ranum</u>, 353 F.Supp.2d 984 (E.D. Wisc. 2005) ("The guidelines' prohibition of considering these factors cannot be squared with the Section 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant.'"); <u>United States v. Myers</u>**,** 353 F.Supp.2d 1026 ((S.D. Iowa, 2005) ("The guidelines prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant....Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range."); <u>United States v. Jaber</u>**,** 362 F.Supp.2d 365 (D. Mass. 2005) ("*Booker* plainly allows courts to look carefully at those factors and to determine to what degree they are relevant to individual cases").

---

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant [§3553(a)(1)];
(2)  the need for the sentence imposed-
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes by the defendant; and
    (D) to provide the defendant with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [§3553(a)(2)];
(3)  the kinds of sentences available [§3553(a)(3)];
(4)  the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range [§3553(a)(4) and (5)];
(5)  the need to avoid unwarranted sentencing disparity among defendants with similar records that have been found guilty of similar conduct [§3553(a)(6)]; and
(6)  the need to provide restitution to any victims of the offense(s) [§3553(a)(7)].

As well, Congress had directed that the district court "shall impose a sentence **sufficient, but not greater than necessary**, to comply with [the purposes of sentencing]" (emphasis added). 18 U.S.C. § 3553(a) (emphasis added). This is the "primary directive" of the sentencing statute. Ranum, 353 F.Supp. 2d at 986; United States v. Pirani, 406 F.3d 543, 564 (8th Cir. 2005) (Bye, J., dissenting) ("factors previously deemed ordinarily irrelevant to sentencing under Chapter 5H of the guidelines such as the defendant's age, education and vocational skills, mental and emotional conditions, physical condition, employment record, family ties and responsibilities, and charitable service are now valid considerations for a court in imposing a sentence").

Arguably, no special weight is to be given to the advisory guidelines or other factors mentioned in the statute. See United States v. Okai, 2005 WL 2042301 (D. Neb. August 22, 2005) ("The Guidelines range is thus one of many factors for the sentencing court to consider, and although the court is not bound by the Guidelines, it must consult them and take them into account when sentencing."); Pirani, 406 F.3d at 564 ("in addition to consideration of the guideline range the court must give equal consideration to sentencing factors such as just punishment, deterrence, incapacitation, rehabilitation, and the need for the sentence to reflect the nature and circumstances of the offense and the history and characteristics of the defendant"); Jaber, 362 F.Supp.2d at 365 (advisory does not mean "slavish application of the Guidelines under the guise of fair "consideration"); United States v. Moreland 366 F.Supp.2d 416 (S.D.W.Va. 2005) ("while I respect the advice of the Guidelines and give it serious consideration, I do not view that advice as carrying greater weight than any of the other § 3553(a) factors"); United States v. Biheiri 356 F.Supp.2d 589 (E.D.Va. 2005) ("no individual factor is singled out as having greater weight; instead, the richness of factual diversity in cases

calls on sentencing judges to consider all of the factors and to accord each factor the weight it deserves under the circumstances.").

**B.      Nature and Circumstances of the Offense, History and Characteristics of the Defendant, and Defendant's Family Ties and Responsibilities**

In the early morning hours of December 16, 2020, after a night of drinking, Ryder did something incredibly stupid.  After months of becoming caught up in ultra-conservative news-outlet information, and allowing himself to be indoctrinated with a dogma spewed by the former president and his followers, Ryder's depression and anxiety found an outlet.  Fueled by his intoxication, Ryder proceeded leave a series of disgusting, racist, and threatening voicemails for six members of Congress regarding the results of the 2020 presidential election.

By doing so, he jeopardized his freedom, placed great burdens on his family, caused the government to expend resources, and besmirched his incredibly honorable military service.  For his actions and their consequences on others, Ryder has great remorse.  He presents himself to this Court as a humble man who did an incredibly stupid thing during a time of strained mental health.  He understands atonement includes punishment by this Court, and part of that punishment has been the time he has relinquished his freedom due to his own actions.

1.      Personal History, Family Ties, Characteristics

Ryder is a father of two young children.  In addition to the victims in this case, and the country as a whole, it is to them, his wife, and this Court that he must seek forgiveness.  Ryder's children have been his appropriate focus since he adjusted to his incarceration in this case.  His wife, Trish, has done an incredibly admirable job in caring for the couple's children and seeing to the logistics of the family's new-found reality.

Ryder was born in April 1987 in Concord.  His birth mother was 15 years old when she gave birth to Ryder, and his aunt and uncle adopted him at birth.  Ryder's parents live in

Barnstead, and they have helped support him, Trish, and the kids throughout this process.

Ryder's parents financially struggled when he was growing up.  They lived in Hampstead and

Epsom at various times.  He recalls a lot of arguing in his home as a child, but there was no

physical violence.  Ryder's mother was very loving and supportive of him, but his father was

physically and emotionally distant as he was often outside of the home due to work or being

voluntarily absent.

Ryder's parents were followers of Scientology during his youth.  Scientology is a set of

beliefs and practices invented by American author L. Ron Hubbard, and an associated

movement.[2]  It has been variously defined as a cult, a business or a new religious movement.

Scientology followers believe that a human is an immortal, spiritual being that is resident in a

physical body.  This spiritual being has had innumerable past lives, and it is observed in

advanced (and – within the movement – secret) Scientology texts that lives preceding the being's

arrival on Earth were lived in extraterrestrial cultures.  Scientology doctrine states that any

Scientologist undergoing "auditing" will eventually come across and recount a common series of

events.  Part of these events include reference to an extraterrestrial life-form.  The secret

Scientology texts say this was a ruler of a confederation of planets 70 million years ago, who

brought billions of alien beings to Earth and then killed them with thermonuclear weapons.

Despite being kept secret from most followers, this forms the central mythological framework of

Scientology's ostensible soteriology – attainment of the state known as "clear."  The Church of

Scientology has been described by government inquiries, international parliamentary bodies,

scholars, law lords, and numerous superior court judgements as both a dangerous cult and

a manipulative profit-making business.

---

[2] The within information regarding Scientology derives from a Wikipedia page about the organization.  See
www.en.wikipedia.org/wiki/Scientology.

Ryder's parents placed him in Scientology school as a child.  He attended this school until he was approximately 10 years old.  In a way of rebelling against the structure and teachings of this "school," Ryder began to have outbursts.  He engaged in two specific acts of youthful anger that resulted in his expulsion from the school.  After that, his mother home-schooled him for a period of time.  He eventually convinced his parents to send him to public school, and he attended middle school in Gilmanton.  Ryder had trouble adjusting to 'regular' school, and he attended three separate high schools in less than two years.  After withdrawing from high school at the age of 16, Ryder obtained his graduate-equivalency degree.

After leaving school, Ryder worked in manual labor.  During his teenage years, Ryder describes things as "rough" for him as he felt lost, without any real guidance or support, and the only type of guidance being provided was through the Church of Scientology.  As one can imagine, this was not helpful and only made things worse for Ryder.  Such an existence led Ryder to contemplate suicide as a young teenager.

In 2009, Ryder enlisted in the United States Navy.  It is no surprise that a young man who desperately sought guidance and structure found his way to the United States Navy.  Ryder served six years dedicated to the important service of our country's safety and security.  Ryder served as a Cryptologic Technician Interpretive, 3rd Class.  He was given top-secret security for his duty.  During his time in the Navy, he learned to fluently speak Mandarin, and he taught himself Cantonese and Japanese.[3]  While in the Navy, he received the Good Conduct Medal as well as the Joint Service Medal.  Ryder earned an Honorable Discharge from the Navy in 2015 obtaining the rank of E-4.  The letters of support attached to this memorandum reflect the incredible work Ryder did while in the Navy.

---

[3] Ryder is also proficient in Portuguese, the first language he learned at the age of 19.

While still in the Navy, in 2013 Ryder returned to school.  He graduated from Southern New Hampshire University in 2016 with a B.A. in mathematics.  Since his first child was born, Ryder has been the primary caregiver to his children.  His wife, Trish, has worked full-time while he did some language tutoring.  The couple also purchased, and Ryder managed, two multi-unit rental real estate properties in Manchester.

Ryder began drinking alcohol when he was around 12 years old.  He began to drink every weekend until he was 16 years old.  At that age his frequency of drinking decreased, but when he drank it was excessive.  He also began smoking marijuana around the age of 12, and this continued until the age of 16.  One night, while using alcohol at that age, Ryder severely burned himself while lighting a bonfire.  He was in the hospital for 10 days, and the incident left him with scars on his face, shoulder, and fingers.  At that time, his parents placed him in the Church of Scientology's 45-day Purification Rundown Program.  His mother was director of this program while he participated in it.  His parents also had him participate in the Scientology Way to Total Freedom program between the ages of 16 and 20, a counseling program.

Ryder did not smoke marijuana while in the Navy.  After leaving the Navy, he discontinued using his Zoloft (discussed later herein), and began to use marijuana to cope with his ever-growing anxiety.  He especially used marijuana to self-medicate when he experienced panic attacks.  His use of alcohol and marijuana continued on a regular basis until 2020, when Ryder decided that it was becoming problematic for him.  He was able to maintain his sobriety for approximately six months, but he resumed using both substances as the presidential election gained news momentum, and it increased until the night he committed the subject offense. Ryder was intoxicated when he committed the subject offenses.

Ryder's mental health has been problematic since his childhood, and one is left to speculate how his childhood experiences have affected his mental and emotional state as an adult.  He did not receive any traditional counseling as a child, and it appears that the teachings of Scientology caused Ryder great conflict in his youth.  Due to their religious beliefs, his parents did not seek any medical treatment for his mental health.  His parents' intervention through Scientology only exacerbated his mental health problems.

While in the Navy, Ryder sought mental health counseling for a brief time while he was posted to the Naval Information Operations Command.  Although Ryder does not recall being specifically diagnosed, his treatment was noted to have addressed "issues around depression and anxiety," the causes of those things, as well as reactions to material of a graphic nature that he observed as part of his service-related duties.[4]  Ryder did not seek further treatment while in the Navy because he thought it would jeopardize his security clearance.

However, in 2013 or 2014 while stationed in Hawaii, his primary care physician prescribed him Zoloft for his depression and valium for panic attacks.  Ryder eventually stopped using both medications due to the various side effects of each.

After law enforcement arrested Ryder, and while incarcerated at the Merrimack County Department of Corrections, Dr. Eric Drogin conducted a psychological assessment of Ryder.  Although Dr. Drogin's report is attached hereto (see Exhibit A), following is a summary of Dr. Drogin's findings regarding Ryder:  he fell within the clinically significant range of affective disturbance when tested for symptoms of depression, his perspective on future events, and recent symptoms of anxiety.  Ryder accurately and honesty recounted his charged acts, and he confirmed to Dr. Drogin that he was intoxicated when he made the subject phone calls.  Ryder

---

[4] Ryder's Naval service records were provided to Dr. Eric Drogin, Ph.D., ABPP, as part of Dr. Drogin's evaluation of Ryder (see *supra*).

consumed a six-pack of beer, two small bottles of sake, and two glasses of tequila.  He also confirmed for Dr. Drogin that his incarceration has resulted in his longest period of sobriety since he was 13 years old.

Dr. Drogin diagnosed Ryder with chronic depression and anxiety, and he recognized his genuine expressions of remorse for his actions in this case, his insight into his ongoing problems, as well as his expressed willingness to seek help.  In light of all of this, Dr. Drogin opined that Ryder is an excellent candidate for success in mental health treatment.  Dr. Drogin recommends outpatient cognitive behavioral therapy with a focus on trauma, affective disorders, and sobriety maintenance.

2.      Nature and Circumstances of the Offense

Ryder committed the acts with which he is charged.  However, he never intended to cause any actual harm.  As well, his actions derived from an alcohol-fueled form of political hysteria that he now renounces.  It is very likely that Ryder's actions in this case, and the mindset that allowed him commit these offenses, is connected to the instability and unusual influences of his childhood.

The investigation in this case began on December 16, 2020, at approximately 12:20 p.m.  An administrative services director for a United States Senator contacted the Capitol Police by email.  That person requested law enforcement to research a threat/voicemail and report back to "to see if perhaps they are [from the Senator's state] or have a violent background."  The next evening on December 17, 2020, at approximately 6:00 p.m., a staff member for a United States Representative provided a voicemail left by Ryder.  Because Ryder had left his name in one of the messages, and because he used a telephone that was registered to his wife at his home, law enforcement was able to immediately identify Ryder as the caller in the two subject voicemails.

It appears from discovery that none of the four other members of Congress who received messages at their offices reported the calls to law enforcement directly.

Four days after the messages were left, and more than three days after law enforcement had identified Ryder as the caller, law enforcement agents went to Ryder's home in Amherst, New Hampshire in an effort to interview Ryder.  When the agents identified themselves to Ryder, he told them he was not interested in speaking to them and then told them to leave his property.  Law enforcement obtained arrest and search warrants the next day, and they went to Ryder's home in Amherst to execute both warrants the day after that.

Regarding count seven (the email), a New Hampshire State Representative contacted law enforcement after he saw news of Ryder's arrest.  He informed law enforcement that he had received the subject email from Ryder, identifying himself by his full name and using email address [rwinegar87@gmail.com](mailto:rwinegar87@gmail.com).

Regarding the telephone messages and email, law enforcement did not discover any evidence of any intent on Ryder's part to carry through with any threats.  As well, in addition to four of the six offices not contacting law enforcement directly about the messages, none of the victims in this case chose to offer any victim impact statements or information.

## IV.    Other 18 U.S.C. § 3553 Factors

### A.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant

A sentence of time-served (amounting to 12 months and one day), or a sentence that requires the remainder to be served on home confinement, followed by period of supervised release, is substantial, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offenses Ryder committed.  The proposed sentence affords

adequate deterrence to criminal conduct, and it protects the public from Ryder committing any

future crimes.  Ryder had never been incarcerated prior to his arrest in this matter, and he has

already experienced life-changing incarceration at this point.

    **B.**    **The Kinds of Sentences Available, the Guidelines and Policy Statements Issued by the Sentencing Commission, Including the Advisory Guideline Range, and the Need to Avoid Unwarranted Sentencing Disparity Among Defendants with Similar Records That Have Been Found Guilty of Similar Conduct.**

The sentence recommended here is available and the variance Ryder requests from the

government's recommendation takes into account all of the 18 U.S.C. § 3553(a) factors as well

as the facts and circumstances of the offense and Ryder.  The sentence does not represent a

marked deviation from the range that similarly situated defendants typically face, and thus

should not cause any significant sentencing disparity among those defendants.

    **C.**    **Other Mitigating Factors**

There are a substantial mitigating factors that call for the sentence requested here.  This

Court may now consider those mitigating factors that the advisory guidelines prohibit: e.g.,

poverty, racial discrimination and humiliation, drug abuse and addiction, dysfunctional family

background, lack of guidance as a youth, etc. See United States v. Ranum, 353 F.Supp.2d 984

(E.D. Wisc. 2005), *et seq.* (infra).  Also, the Defendant here notes that many courts believe that

the Sentencing Guidelines are generally too harsh.  See August 9, 2003 Speech of Justice

Anthony Kennedy at the ABA Annual Meeting (available at

**http://www.abanews.org/kencomm/amkspeech03.html**) ("Our resources are misspent, our

punishments too severe; our sentences too long... the sentencing guidelines are responsible in

part for the increased terms.... [and they] should be revised downward."); Ranum**,** 353 F.Supp.

2d at 985 n.1 (quoting Justice Kennedy's statement that "our punishments [are] too severe, our

sentences too long"); United States v. Antonakopoulos 399 F.3d 68, 81 (1st Cir. 2005) ("History shows that the mandatory nature of the Guidelines has produced particular results which led trial judges to express that the sentences imposed were unjust, grossly unfair, or disproportionate to the crime committed, and the judges would otherwise have sentenced differently."); Montanye v. United States, 77 F.3d 226, 233 (8th Cir. 1996) (Bright, J., dissenting) ("By any ordinary measure outside the guidelines, I would think this sentence would be considered draconian, unnecessarily harsh and unreasonable."); United States v. Andruska, 964 F.2d 640, 646-47 (7th Cir. 1992) (Will, Senior Judge, concurring) ("the irrationality and draconian nature of the Guidelines sentencing process is again unhappily reflected in this case").

      1.    This Is Ryder's First Conviction and Incarceration

      Prior to this matter, Ryder had never been charged, let alone convicted, of any offense. At this age, these factors reflect that the effects of incarceration and being a life-long federal felon will act as substantial punishment for an honorably-discharged veteran, and they will act as a specific and general deterrent.  Many courts across the nation have recognized this rationale as a reason or basis to apply a below-guideline sentence.  See United States v. Paul, 561 F.3d 970 (9th Cir. 2009) (where defendant convicted of embezzlement and guidelines 10-16 months, court's within guideline sentence of 15 months unreasonably high in part because Paul was a first-time offender with no criminal record whatsoever); United States v. Autery, 555 F.3d 864 (9th Cir. 2009) (where defendant convicted of possession of child pornography and where guidelines 41-51 months, court's *sua sponte* variance to probation not unreasonable in part because defendant's first conviction and Crim. History Level I "did not fully account or his complete lack of criminal history" because defendant with minor criminal history still falls in category I);  United States v. Huckins, (10th Cir. 2008) 529 F.3d 1312 (where defendant

convicted of possession of child pornography and guidelines 78-97 months, court's variance to 24 months proper in-part because this was  defendant's first conviction – rejecting government's argument that guidelines already considered this by placing defendant in criminal category I "although the Guidelines discourage granting a downward departure based upon criminal history when the defendant has been placed in a criminal history category of  I … this is a not a departure case, it is a variance case … and, after *Gall* and *Kimbrough*, a factor's disfavor by the Guidelines no longer excludes it from consideration under § 3553(a)....  Therefore, a district court may weigh a defendant's lack of a criminal record, even when the defendant has been placed into a criminal history category of I, in its § 3553(a) analysis."); see also Report of USSC (May 2004) "*Recidivism and the 'First Offender'*,"  ("The analysis [of empirical data on re-offending] delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points.  Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism risk of all."); United States v. Duane, 533 F.3d 441 (6th Cir. 2008) ("[T]he district court did not respond to Duane's first argument — that he deserved a more lenient sentence because he had zero criminal history points.  This was not a particularly strong argument given that Duane's criminal history category was taken into account in determining his Guidelines range.  But the argument was not completely frivolous.  Because Duane had zero points at age 57, he might plausibly argue that even category I — which applies when a defendant has zero or one criminal history point(s) — overstated his criminal history to some degree."); United States v .Cabrera, 567 F.Supp.2d 271 (D. Mass. 2008) (where defendant convicted of possession of drugs with intent to distribute and

guidelines 70-78 months, court imposed sentence of 24 months in part because "concerns about recidivism (see 18 U.S.C. § 3553(a)(2)(c)) compel a sentence still substantially" lower).  The Sentencing Commission's report, Recidivism and the "First Offender" (May 2004), available at http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf, suggests that individuals -- like Abiola -- with zero criminal history points are less likely to recidivate than all other offenders … even for offenders with only one criminal history point. Id. at 13.

As well, Ryder is a first-time offender, and any amount of prison time is more significant to him as compared to someone who has previously been incarcerated.  United States v. Paul 2007 WL 2384234 (9th Cir. Aug. 17, 2007) (unpub.) (within guideline sentence of 16 months (high end) for taking government money unreasonably high in part because Paul was "a first-time offender with absolutely no criminal record whatsoever"); United States v. Baker, 445 F.3d 987 (7th Cir. 2006)  (in distribution of child pornography case, court affirms below-guideline sentence of 78 months (guidelines called for 108) noting that "significant is the district court's finding that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned.  Consideration of this factor is consistent with§ 3553's directive that the sentence reflects the need for "just punishment," id. § 3553(a)(2)(A), and "adequate deterrence," id. § 3553(a)(2)(B)"); United States v. Santoya, 493 F.Supp.2d 1075 (E.D. Wisc. 2007) (in distribution of cocaine case where defendant was career offender, below-guideline sentence appropriate because a lesser period of imprisonment necessary to deter a defendant who has not previously been subject to lengthy incarceration and where "the sentencing commission has acknowledged that when career offender status is based on relatively minor drug offenses, the guidelines may create a sentence greater than necessary");  United States v. Willis, 479 F.Supp.2d 927 (E.D. Wis. 2007) (in drug case where guideline range was 120 months but

statutory maximum was 60 months, sentence of one year and one day sufficient in part because sentence "sentence provided a substantial punishment for someone like defendant, who had never before been to jail and who engaged in no violence or dealing herself"); United States v. McGee, 479 F.Supp.2d 910 (E.D. Wisc. 2007) (in heroin distribution case where guideline range was 21-27 months because defender got mitigating role reduction and safety valve, sentence of one year and one day imposed because guideline range in part because defendant "had never before been to prison and 'generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to reoffend."); United States v. Cull, 446 F.Supp.2d 961 (E.D. Wisc. 2006) (in marijuana case where guidelines 10 to 14 months, though defendant "not entitled to departure under pre-Booker standards"  and where "nothing extraordinary about the case or the defendant," court imposed two months jail with four months home confinement as a condition of supervised release imposed because "Defendant had never been confined before, so [two months jail time] was sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances."); United States  v. Qualls, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously  subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

    2.  Further Incarceration Would Have Increased Adverse Effects on Family

  This Court should also consider the impact upon Ryder's family should he be further incarcerated as a reason to impose a below-guideline sentence.  His family, his wife and children, have suffered as a result of his actions that have led to his incarceration.  See United States v. Leon, 341 F.3d 928 (9th Cir. 2003) (in false income tax return case, court affirmed district

court's downward departure of six levels from 30 months to 10-16 months granted because defendant sole caregiver of his wife who suffered from renal failure and is suicidal); United States v. Aguirre, 214 F.3d 1122 (9th Cir. 2000) (within district court's discretion to depart downward 4 levels for extraordinary family circumstances "based on the fact that there is an 8 year-old son who's lost a father and would be losing a mother for a substantial period of time"); United States v. Dominguez, 296 F.3d 192 (3rd Cir. 2002) (in bank fraud case, district court erred in holding it could not depart four levels downward for defendant who resided with her elderly parents, who were physically and financially dependent upon her where father had undergone brain surgery and had suffered a heart attack,... circumstances were "truly tragic"); United States v. Owens, 145 F.3d 923 (7th Cir. 1998) (affirmed downward departure from level 32 (169 to 210 months) to 120 months under 5H1.6 for defendant convicted of possession of crack cocaine with intent to distribute where district court said defendant's situation "differs from that of a typical crack dealer in that [the defendant] takes an active role in raising his children and supporting his family." ); United States v. Galante, 111 F.3d 1029 (2d Cir.1997) (affirmed district court's 13-level downward departure in drug case from 46-57 months to 8 days – where defendant showed he was a conscientious and caring father of two young sons who would have faced severe financial hardships ); United States v. Milikowsky, 65 F.3d 4, 8 (2d Cir. 1995) ("Among the permissible justifications for downward departure ... is the need, given appropriate circumstances, to reduce the destructive effects that incarceration of a defendant may have on innocent third parties."); United States v. One Star, 9 F.3d 60 (8th Cir. 1993) (felon in possession – departure downward from 33 months to probation proper where defendant not dangerous, possessed revolver in self-defense, had strong family ties, and lived on Indian reservation).

Here, Ryder was the primary physical caretaker for his two children while his wife worked fulltime.  His incarceration has placed an incredible burden on his wife.  The family has struggled financially due to Ryder's incarceration, but more importantly the family unit has been torn apart.  Ryder's children have had their father taken away from him while their lives have been in constant flux, and further incarceration will impose more of a punishment on them and his wife.

       3.      <u>Post-offense rehabilitation.</u>

Many courts have held that post-offense rehabilitation may be a basis to support sentencing below the applicable guideline range.  *See, e.g.,* <u>United States v. Bradstreet</u>, 207 F.3d 76, 78 (1st Cir. 2000) (affirming downward departure for post-sentencing rehabilitation); <u>United States v. Sally</u>, 116 F.3d 76, 80 (3rd Cir. 1997) (holding post-offense rehabilitation efforts may constitute a sufficient factor warranting downward departure provided that efforts are so exceptional as to remove the particular case from the heartland in which the acceptance of responsibility guideline was intended to apply); <u>United States v. Chapman</u>, 356 F.3d 843 (8th Cir. 2004) (holding that post-offense rehabilitation can warrant departure eve if defendant did not accept responsibility); <u>United States v. Whitaker</u>, 152 F.3d 1238, 1240-41 (10th Cir. 1998) (authorizing departure for post-offense drug rehabilitation, overruling prior circuit precedent).

Since being arrested in this matter, Ryder has successfully participated in the RU Inside Jail & Prison Program.  This is a faith-based workbook program that Ryder has diligently pursued while he has been incarcerated in this matter.  He has pursued this program to make him a better person, as well as understand the factors inside him that brought him to the point in his life where he committed the subject offenses.  Counsel possesses certificates from this program should the Court or Probation wish to see them.

        4.      <u>Ryder Has Incredible Personal Support</u>

Despite his actions, and their national publication, many people support Ryder because they know him as a good and honorable man, as well as a devoted father and husband. Although the Court will read the many letters of support attached hereto, <u>see</u> Exhibit B, the Court will find below just some of things people who know Ryder say about him:

- He is loyal, passionate, and devoted to friends and family;

- He is kind, helpful, and friendly;

- He is a generous and has integrity;

- He is a great friend and soldier;

- He focuses on his children more than himself;

- He is intelligent, loving, and compassionate; and

- He is sentimental and caring.

These are just some of the things that the people who know Ryder as a person think and say about him. They are a reflection of who he is as a person as opposed to what he did in this case.

        5.      <u>Ryder Received Lack of Guidance in His Youth</u>

The Court also should consider that Ryder had a lack of guidance as youth due to the nature in which he was raised. Again, one can reasonably consider whether and to what extent Ryder's experiences as a child allowed him to become caught up in frenzied pollical maelstrom that resulted from the 2020 presidential election. <u>See</u> <u>United States v. Floyd</u>, 945 F.2d 1096 (9th Cir. 1991) (in drug case, court affirms departure from guideline range of 30 years to life to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth – rendering defendant less culpable; also observing that "a criminal sentence must reflect an individualized assessment of a particular defendant's culpability rather than a mechanistic

application of a given sentence to a given category of crime"); Landrigan v. Schriro  441 F.3d

638, 648 (9th Cir. 2006) ("Where a defendant's crime is attributable to a disadvantaged

background or emotional or mental problems the defendant is less culpable than one without the

excuse.").

6.      Home confinement is a substantial punishment.

In this case, for this defendant, a sentence of home confinement following his 10-month

period of incarceration will be a substantial punishment.  For someone who has never been

incarcerated before, in light of this offense, home confinement is an appropriate sanction

subsequent to his period of incarceration.  See United States v. Bueno, 549 F.3d 1176 (8th Cir.

2008) (where defendant possessed more than 70 kilograms of cocaine, and guidelines 108-135

months, sentence of probation with house arrest for five years not unreasonable given wife's life-

threatening illness and dependence on defendant and "as the Court noted in Gall, 'Offenders on

probation are nonetheless subject to several standard conditions that substantially restrict their

liberty,'…and as the district court observed in this case, Bueno is subject to house arrest during

the entire five-year period of probation."); United States v. Munoz-Nava, 524 F.3d 1137 (10th

Cir. 2008) (in drug case where guidelines 47-56 months, district court's sentence of one year and

day in prison and one year home detention reasonable in part because "home confinement and

supervised release substantially restrict the liberty of a defendant….  The imposition of home

confinement and supervised release contributes to our conclusion that Muñoz-Nava's sentence is

reasonable.").

**V.      Request for Relief**

Wherefore, Ryder Winegar, through counsel, respectfully requests that the Court grant

the relief requested, specifically that the Court impose the following sentence:

a)      Time served, followed by a term of supervised release;

b)      If additional incarceration is imposed to have it served on home confinement; and

c)      The $100.00 special assessment fees.

Finally, the Defendant requests any such other relief as may be deemed just and

equitable.


                                    Respectfully submitted,


                                    Ryder Winegar
                                    By and through his counsel,


DATED:  November 19, 2021           /s/Charles J. Keefe
                                    Charles J. Keefe (N.H. Bar No. 14209)
                                    Wilson, Bush & Keefe, P.C.
                                    378 Main Street
                                    Nashua, NH 03060
                                    (603) 595-0007
                                    keefe@wbdklaw.com



                        **Certificate of Service**

I, Charles J. Keefe, hereby certify that true copies of the above document were delivered
to AUSA Charles Rombeau and the United States Probation Office.


                                    /s/Charles J. Keefe
                                    Charles J. Keefe