# Eric Y. Drogin, J.D. Ph.D., ABPP

### Clinical and Forensic Psychologist

**350 Lincoln Street, Suite 2400**
**Hingham, Massachusetts 02043-1579**

11 November 2021

Charles J. Keefe, Esquire
*Wilson, Bush, & Keefe*
378 Main Street
Nashua, New Hampshire 03060

RE:    *U.S.A. v. Ryder Winegar*

Dear Attorney Keefe:

Following is a report of psychological assessment results in the above-styled case, pursuant to examinations conducted in August and November 2021 on the premises of the Merrimack County Department of Corrections in Boscawen, New Hampshire.

EVALUATION MEASURES EMPLOYED

The following psychological testing measures were employed in your client's evaluation, in addition to forensic interviewing and a review of your client's currently available legal and clinical documentation:

- *Beck Anxiety Inventory (BAI)*

- *Beck Depression Inventory (BDI-2)*

- *Beck Hopelessness Scale (BHS)*

- *Cognitive Capacity Screening Examination (CCS)*

- *Miller Forensic Assessment of Symptoms Test (M-FAST)*

*(339) 200-9131 (voice)*     *(339) 200-3025 (facsimile)*     *eyd@drogin.net*     *edrogin@bidmc.harvard.edu*

Diplomate in Forensic Psychology, American Board of Professional Psychology
Registrant, National Registry of Health Service Psychologists

*U.S.A. v. Ryder Winegar*                                                                     2
*Psychological Evaluation*


DESCRIPTION OF EXAMINATIONS AND RESULTS

Mr. Winegar was initially examined on 03 August 2021, on the premises of the Merrimack
County Department of Corrections in Boscawen, New Hampshire.  Informed of the usual
limitations concerning confidentiality and privilege in forensic matters, your client agreed to
participate in this evaluation subsequent to a detailed explanation of its nature and purpose.

Presenting as a 34-year-old, institutionally attired male with adequate hygiene, Mr. Winegar was
polite, cooperative, and responsive.  His speech was normal for volume, pace, pressure, tone,
articulation, and content.  A full range of affect was displayed.  Psychomotor functioning rested
within grossly normal limits.  No overt indicia of acute psychosis or apparent physical distress
were noted.  Your client repeatedly denied any feelings, plans, or intent to harm either himself or
anyone else.

Mr. Winegar claimed to have consumed lunch prior to this mid-afternoon examination.  No
current medication was identified.  Your client recalled having slept for approximately 10 to 12
of the preceding 24 hours.  He claimed to possess adequate vision and hearing, and confirmed
that he was not suffering from any acute physical condition that would interfere with the
assessment process.

The **CCS** was administered in order to screen for the presence of cognitive deficits.  Mr.
Winegar's raw score of 30 out of a possible 30 points on this measure did not reflect any
problems regarding orientation, concentration, calculation, short-term memory, or abstract
reasoning.

**BDI-2** testing was utilized to screen for the presence of current and recent symptoms of
depression.  Mr. Winegar's raw score of 30 out of a possible 63 points fell within the clinically
significant range of affective disturbance.  The following verbatim test item response was noted:
"I don't have any thoughts of killing myself."

**BHS** testing addressed Mr. Winegar's perspective on future life events.  His raw score of 11 out
of a possible 20 points fell within the clinically significant range of affective disturbance.

**BAI** testing was employed to assess Mr. Winegar's reporting of current and recent symptoms of
anxiety.  His raw score of 30 out of a possible 63 points fell within the clinically significant
range of affective disturbance.

**M-FAST** testing was applied as a screening measure for Malingering. Mr. Winegar's raw score
of 3 out of a possible 25 points on this measure did not depict him as exaggerating of fabricating
a major psychiatric condition.

Subsequently examined on 01 November 2021 at the same location, Mr. Winegar agreed to
ongoing participation in this evaluation subsequent to an updated reminder of its confidentiality
and privilege limitations, nature, and purpose.  He presented in the same fashion as that observed
previously, and again denied any feelings, plans, or intent to harm either himself or anyone else

Mr. Winegar claimed to have consumed dinner during the evening preceding this early morning examination. No current medication was identified. Your client recalled having slept for approximately six of the preceding 24 hours. He claimed to possess adequate vision and hearing, and confirmed that he was not suffering from any acute physical condition that would interfere with the assessment process.

When interviewed on this occasion, Mr. Winegar indicated that he had been charged with "criminal threatening of a government official." He noted that this was described as having occurred "last December," by means of "phone and email." Your client specified that his charges involved "Members of Congress and a State Representative from New Hampshire."

Mr. Winegar identified the focus of his charges as his having "said I was going to hurt or kill them for some political reasons." He explained that "with the Congressmen, it was with certifying Trump as President." Your client added that with respect to the "State Representative" the topics in question had to with a "social media" posting and "voter fraud."

Specifying that "all of the calls were on one day" with "email a few days prior," Mr. Winegar stated that he had been intoxicated when the calls were made. He specified that during the roughly seven to eight hours preceding the calls he had steadily consumed a six-pack of beer, two approximately 650 ml. bottles of Sake, and at least two tumblers of Tequila. Your client observed that no other legal or illegal substances were involved, including any prescription or over-the-counter medications.

Mr. Winegar indicated that he assumed he had eaten dinner that evening, although he could not be sure. He maintained that he "hadn't been sleeping well," and had been experiencing "probably a headache" leading up to the time the calls were made. In addition, your client asserted that at that time he had been suffering from "insomnia" for perhaps 10 days, resulting in interrupted sleep that totaled "less than two hours" per 24-hour cycle.

Overall, Mr. Winegar described himself as having been "really drunk" at the time of the calls in question, and noted that he did not even recall making the calls until experiencing a "flash" of memory when subsequently speaking with counsel. He stated concerning the date of the email that his alcohol ingestion had been "pretty much the same," that he was "similarly" intoxicated, and that he did not recall what else he might have been taking at that time, although "I did remember sending the email."

Mr. Winegar claimed that he did not remember having experienced any auditory, visual, olfactory, tactile, or gustatory hallucinations during the period in question, although he recall having entertained concerns that "the Chinese would invade" in conjunction with the political situation. He allowed that this constituted a "dramatic misinterpretation of events" that was based upon "news" and "social media" input as opposed to being the product of paranoid delusions. Recalling that he had felt "offended" by what he had deemed "blatant election cheating" and "fraud," your client maintained that he now felt "awful" about having made the communications in question, and that "the person I want to be is not the person who uses threats or force of any kind."

Mr. Winegar denied ever having been psychiatrically hospitalized, but acknowledged that he had been engaged in psychotherapy and counseling. He recalled that this had initially occurred perhaps eight to 10 years ago when he was posted to the Naval Information Operations Command (NIOC). This treatment was noted to have addressed "issues around depression and anxiety and what caused it" including reactions to material of a "graphic" nature that your client had been reviewing as part of his service-related duties.

Consistent with recently obtained clinical documentation, Mr. Winegar recalled that about four years ago he was treated at St. Joseph's Hospital in Nashua, New Hampshire. He described the focus of these services as involving family problems and recollections of allegedly being subjected to abuse. Your client remembered thinking that "I was being spied on by the Church of Scientology," that "there were cameras in the woods," and that "my parents were spying on me," prompting him at one point to consult the local police.

Mr. Winegar asserted that he would benefit from mental health assistance in the future, observing that in fact "this is the longest I've been sober since I was 13 years old," and that "I've had issues stemming from childhood" involving "mistreatment" within his family that was "sometimes physical." Your client maintained that "these issues have taken me away from my family" and concluded that it was a "total certainty" that he would be seeking mental health services.

CONCLUSIONS

Mr. Winegar presents as an individual of presently unimpaired cognitive status. He clearly suffers from chronic depression and anxiety. Your client handily passed a measure designed to detect the presence of Malingering.

In light of his sound intellectual functioning, his cooperativeness with the assessment process, his transparently genuine expressions of remorse, his insight into his ongoing problems, and his expressed willingness to seek assistance, Mr. Winegar is an excellent candidate for success in mental health treatment.

The preferred psychotherapeutic modality for Mr. Winegar is outpatient cognitive behavioral therapy, with a focus on trauma, affective disorders, and maintenance of sobriety. It is fortunate that your client resides in an area where such services are readily obtainable from appropriately trained and well-established clinicians in both private and institutional practice.

Please contact me at your convenience if you have any questions concerning this report.

Sincerely,

Eric Y. Drogin, J.D., Ph.D., ABPP
Licensed Clinical Psychologist